ROBERT S. GIANELLI, #82116
LOTTE COLBERT, # 207157
JULLY C. PAE, # 233565
GIANELLI & MORRIS, A Law Corporation
888 W. Sixth Street, 9th Floor
Los Angeles, CA 90017
Tel: (213) 489-1600; Fax: (213) 489-1611

RONALD A. MARRON, #175650
LAW OFFICES OF RONALD A. MARRON
A Professional Law Corporation
3636 Fourth Avenue, Suite 202
San Diego, CA 92103
Tel: (619) 696-9006; Fax: (619) 564-6665

Attorneys for Plaintiffs
ROSALIE VACCARINO AND
DAVID LEE TEGEN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSALIE VACCARINO AND DAVID LEE TEGEN, on behalf of herself and all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>MIDLAND NATIONAL LIFE INSURANCE COMPANY; and DOES 1-100, Inclusive,<br><br>Defendants. | CASE NO.: CV11-5858-CAS(MANx)<br>Assigned to: Hon. Christina A. Snyder<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. BREACH OF UNFAIR COMPETITION LAW;**<br>**2. FRAUD;**<br>**3. BREACH OF CONTRACT;**<br>**4. DECLARATORY RELIEF** |

1

Plaintiffs bring this action on behalf of themselves and all others similarly situated, and on behalf of the general public, against Midland National Life Insurance Company, and Does 1 through 100 as follows:

## NATURE OF THE ACTION

1.      In *Peterman, et al. v. North American Co. for Life and Health Ins., et al.,* Los Angeles Superior Court Case No. BC357194, a class of persons age 65 and older alleged that deferred annuities they purchased from the defendant here, Midland National Life Insurance Company ("Midland"), failed to provide proper disclosure of costly surrender penalties and hid its plan to shift the cost of a purported bonus and high sales commissions back to purchasers. During the course of that case, the court determined that Midland had failed to properly disclose the surrender penalties rendering them unenforceable. The court then certified the case as a class action. Midland settled that case before trial, as it later did with a national class action (*In re Midland National Life Ins. Co. Annuity Sales Practices Litigation,* United States District Court for the Central District of California MDL No. 07-1825 CAS (MANx)) and a Hawaii state class action (*Yokoyama v. Midland National Life Ins. Co.,* United States District Court for the District of Hawaii Case. No. CV-05-00303-JMS). What Midland has not done is provide redress for those under age 65 who purchased its products and were subjected to the same wrongful acts.

///

///

*Third Amended Class Action Complaint*

2.      Midland captured a $2 billion a year share of the deferred annuity market in less than three years. This financial fete was accomplished through a simple but intrinsically deceptive plan: offer the selling agents high commissions and provide them with products to peddle to those approaching retirement with promises of a bonus and financial growth while concealing that the cost of the bonus and high sales commissions would be shifted back to purchasers through lower returns. While Midland proclaimed the advantages of a large bonus, stock-market-linked growth, tax-deferred growth, and other benefits, it hid its actuarial plan to recover these high costs over the term of the annuities. Moreover, for those who exited the policy before Midland could fully recover these costs, it applied an unintelligibly described "Interest Adjustment" to boost surrender penalties. For those who were ages 60 through 64 at the time of purchase, Midland has failed to properly disclose all surrender penalties in conformity with California law, as was determined in *Peterman, et al. v. North American Co. for Life and Health Ins., supra.*

## THE PARTIES

3.      Plaintiff Rosalie Vaccarino is and, at all times mentioned herein, was a resident and citizen of the State of California, County of Riverside.

4.      Plaintiff David Lee Tegen was, at the time of purchase, a resident and citizen of the State of California, County of Los Angeles. Plaintiff Tegen is now a resident and citizen of the State of California, County of Orange.

*Third Amended Class Action Complaint*

5.     Midland is an insurance company licensed to do business in California but has not designated a principal place of business in California.

## SUBSTANTIVE ALLEGATIONS

6.     Midland has been actively engaged in selling deferred annuities to people throughout the United States. Deferred annuities are annuities which defer payments until the annuity "annuitizes," that is, results in a stream of payments at the end of the contract period. During the deferral period of these annuities, an insurer credits monies to the purchaser's "Accumulation Value" (returns).

7.     Midland has captured a $2 billion a year market share in deferred annuity sales by engaging in deceptive and unlawful business practices. Midland recognized that the key to selling annuities was to induce sales agents to sell its annuities over those of other companies by offering agents exorbitantly high sales commissions and arming them with "user friendly" products that purportedly provide a "bonus," stock market-type returns, and other benefits.

8.     To this end, Midland designed and sold "equity indexed" annuities that "link" their performance to certain stock indexes and provide a "bonus," a percentage of additional interest (e.g., 11%) credited to the annuity's "Accumulation Value," a notional account, at the time of purchase. Midland knew, however, that the bonus and high commissions were costs that it would claw back from purchasers by lowering the amount of the returns it was required to credit each year under the contracts. Midland knew it would amortize these costs over the term

4

of the contract and thereby shift them back to the purchasers in the form of lower returns.

9.    Midland has used standardized sales brochures and disclosure statements to sell its deferred annuities. In these materials, Midland makes uniform representations about the growth potential of its annuities, including the amount of a "bonus," growth linked to stock indexes, and tax-deferred growth.

10.    Midland has required that the selling agents, who are contracted and appointed with Midland, provide these materials to all prospective purchasers at the point of sale. Midland also has prohibited the selling agents from making any statements to purchasers that differ from these materials by requiring the agents to attest to same in the disclosure statements. ("I have made no statements which differ in any significant manner from this material." *Yokoyama v. Midland National Life Ins. Co.* (9th Cir. 2010) 594 F.3d 1087, 1090, reversing denial of class certification based upon Midland's use of standardized documents in selling deferred annuities.)

**The Bonus**

11.    Midland's sales brochures and disclosure statements represent that a bonus amount will be provided on purchase. For instance, the sales brochure for the "Bonus 11" annuity, the products purchased by Plaintiff Vaccarino, states: "The Bonus 11 from Midland National Life Insurance Company is a flexible premium deferred fixed annuity which awards you an eleven percent premium bonus on all premiums received in the first five years." The corresponding disclosure statement

provides an acknowledgement that the purchaser has reviewed the sales brochure and states: "The Bonus 11 is a flexible premium deferred fixed annuity that offers an eleven percent premium bonus on all premiums received in the first five contract years."

12.    The sales brochure for the "Legacy Bonus 11," the product purchased by Plaintiff Tegen states "The Midland National Legacy Bonus 11 is a flexible premium fixed index annuity which awards you an eleven percent bonus on all premiums received during the first year." The corresponding disclosure statement provides an acknowledgement that the purchaser has reviewed the sales brochure and states: "The Midland National Legacy Bonus 11 is a flexible premium deferred fixed annuity that offers an eleven percent premium bonus on all premiums received in the first year."

13.    In addition thereto, Midland's annuity contracts make the specific promise that a bonus will be applied to the premium deposited into the annuity in accordance with the bonus percentage listed on the Specifications Page. The two "Bonus 11 annuities" Midland sold to Plaintiff Vaccarino and the "Legacy Bonus 11" annuity sold to Plaintiff Tegen state that the bonus percentage is "11%" and show a "Premium Including Bonus" figure equal to the premium deposited and an additional 11%.

14.    Contrary to these representations and agreements, Midland recalculated and set the returns marginally lower each year so as to recoup the cost of the bonus

over the term of the contract's 14-year surrender period. Midland's actuary has admitted that the cost of the bonus was amortized by Midland over the term of the contract through the payment of slightly lower annual returns: "The commissions, bonuses and other costs are costs incurred by the company, and the company anticipates recovering those costs over time as part of the pricing spread, and so it's the amortization of those costs, if you will." Thus, there was no real bonus. Midland merely stated that the Accumulation Value was increased by 11% at purchase but by the time purchasers such as Plaintiffs can access that account without a surrender penalty (representing the unamortized recovery of Midland's costs including the bonus) Midland will have fully recovered the bonus amount through the allocation of lower returns.

**Recovery of the High Commissions**

15.   As stated above, Midland marketed the annuities as a retirement vehicle with an asset accumulation objective, representing that purchasers would enjoy growth "linked" to stock indexes, tax-deferred growth, and other benefits so as to allow purchasers to "achieve your goals for retirement." Indeed, the "value" the contracts refer to is an "Accumulation Value," representing the accumulation of retirement monies during the annuities' deferral period.

16.   Midland, however, knowingly compromised this asset accumulation objective by paying high commissions to the selling agents to induce them to sell its products over those of its competitors. So rather than provide purchasers with an

*Third Amended Class Action Complaint*

investment vehicle that actually uses the principal invested to achieve returns, Midland reduces this investment asset by the monies paid out the door to the selling agents, directly undermining the accumulation objective Midland promotes. Instead of crediting "higher returns," Midland depresses the returns to recover the cost of the high commissions paid the selling agents.

17.     Despite Midland's promotion of the annuities' as asset accumulation vehicles for retirement with growth "linked" to stock indexes, tax-deferred growth, etc., Midland fails to disclose, and conceals, that it pays high sales commissions to the agents and that it recoups this cost from purchasers through lower returns. Neither the sales brochure nor the disclosure statement make any disclosure of these material facts.

**The Interest Adjustment**

18.     For those who surrendered prior to the end of the surrender period—before Midland could fully amortize the cost of the bonus and the high commissions—Midland applied surrender penalties which it boosted through an incomprehensible "Interest Adjustment" provision. The Interest Adjustment was used to shift the risk of changing interest rates from it to the purchasers on surrender. The annuities do not actually state how the adjustment functions but, instead, set forth a three-variable fractional exponential formula which has a built-in bias towards loss of value, with rising, flat, or slightly fallen declared interest rates, all resulting in an increase in the surrender penalties.

*Third Amended Class Action Complaint*

The Interest Adjustment formula states:

6.3 Interest Adjustment: We may make an interest adjustment on amounts withdrawn from this Certificate.

An applicable interest rate adjustment will be calculated by multiplying the amount withdrawn before the reduction for any surrender charge by the formula descried below:

$$[(1 + io - .005)/(1 + it)^\wedge(T)$$

io = The current interest rate (excluding any additional interest) when this Certificate was issued.

it = The current interest rate (excluding any additional interest) offered for new Certificates.

T = Time in years as follows:

Number of days from the date of the partial or full surrender to the end of the current Certificate Year divided by 365; plus whole number of years remaining in the Surrender Period.

An interest adjustment will only be made when a surrender charge is deducted.

19.     Not only is the formula incomprehensible, it fails to clearly and plainly advise purchasers that it is really a penalty. Additionally, the contract does not state that an Interest Adjustment will apply on partial surrender but Midland's applies an Interest Adjustment to any partial surrender that exceeds the 10% penalty free withdrawal amount.

**Violation of Insurance Code section 10127.13**

20.     For those who were ages 60 to 64 at the time of purchase, Midland failed to provide proper disclosure of all surrender charges, including the Interest

Adjustment described above, as required by Insurance Code section 10127.13.

Under that statute, Midland was required to disclose the surrender period and "all associated penalties" on the cover page of any annuity sold to any person age 60 and older or, alternatively, to state on the cover page where in the contract that information could be found.

21.    In *Peterman, et al. v. North American Co. for Life and Health Ins., et al.,* the court determined that Midland's failure to provide the necessary warning for seniors on the cover of the annuities rendered those penalties unenforceable and Midland's enforcement of those penalties a breach of contract:

> Although the statute is silent on the consequences of non-compliance, permitting enforcement of surrender penalties without the extraordinary notice mandated by section 10127.13 would, as in *Malek*, improperly render the statutory requirement optional rather than mandatory. Moreover, remedying the illegality by refusing enforcement of the surrender penalties is consistent with the case law holding that an exclusion from insurance coverage is unenforceable if it is not clear, plain and conspicuous. As in *Malek*, the Defendants in this case are part of the insurance industry that is subject to a detailed regulatory scheme, and they should have been aware of the requirements of section 10127.13 insofar as Defendants sold annuities in California to California residents.

22.    Despite the ruling in *Peterman*, Midland has continued to assess these illegal and unenforceable penalties to persons who were not in the *Peterman* class but who fall within the class of persons protected by Insurance Code section 10127.13, persons who were 60 and older at the time of purchase.

///

///

**The Sale to Rosalie Vaccarino**

23.     On or about March 25, 2003, Plaintiff Rosalie Vaccarino (Vaccarino) met with Midland's appointed agent John Clark in Wildomar, California. Mr. Clark presented Vaccarino with a sales brochure and disclosure statements for a "Bonus 11" annuity with Midland. Vaccarino reviewed the materials with Mr. Clark and signed the disclosure statements. Vaccarino decided to buy two Bonus 11 annuities because of the monies she would receive as a result of the 11% bonus and the potential for higher returns, as set forth in the sales brochure and disclosure statements. Thereafter Midland issued her Certificate No. 850013929 with an Initial Premium of $112,214.15 and Premium Bonus of $12,343.56 and Certificate No. 8500139289 with an Initial Premium of $70,261.54 and a Premium Bonus of $7,728.77. Vaccarino was 63 years old at the time of the purchases.

24.     On April 25, 2011 Vaccarino made a partial surrender under Certificate No. 850013929 and Midland enforced a surrender penalty, including an Interest Adjustment, despite its knowledge that surrender penalties could not be enforced in California for purchasers age 60 and older due to its violation of Insurance Code section 10127.13.

**The Sale To David Tegen**

25.     On February 17, 2004 Plaintiff David Tegen (Tegen) met with Midland's appointed agent Gregory Fox, in Long Beach, California. Mr. Fox presented a brochure and disclosure statement for a "Legacy Bonus 11" annuity

from Midland. Tegen reviewed the materials with Mr. Fox and signed the disclosure statement. Tegen decided to buy the Legacy Bonus 11 annuity because of the monies he would receive as a result of the 11% bonus and the potential for higher returns, as set forth in the sales brochure and disclosure statements. Thereafter Midland issued him Certificate No. 8500169890 with an Initial Premium of $46,270.22 and Premium Bonus of $5,089.72. Tegen was 56 years old at the time of the purchase.

## CLASS ACTION ALLEGATIONS

26.     Pursuant to California Code of Civil Procedure section 382 and California Rules of Court, Rule 3.765, Plaintiffs seek class certification of the following Class and Subclass:

> All California residents (persons, trusts, or entities) who purchased deferred annuities from Midland National Life Insurance Company when they (or the annuitants) were age 64 or younger.

> All California residents (persons, trusts, or entities) who purchased deferred annuities from Midland National Life Insurance Company when they (or the annuitants) were ages 60 through 64.

27.     Excluded from the Class and Subclass are: any officers, directors, employees or legal representatives of Midland.

28.     The members of the Class and Subclass ("class members") are so numerous that a joinder of all members is impracticable. While the exact number of

*Third Amended Class Action Complaint*

class members is unknown to Plaintiffs at this time, it is believed there are thousands of class members.

29.     Plaintiffs' claims are typical of the claims of the class members and are similarly affected by Midland's wrongful conduct.

30.     Plaintiffs will fairly and adequately protect the interests of the class members and have retained counsel competent and experienced in class and insurance litigation.

31.     Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual members of the Class and Subclass.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since a joinder of all members is impracticable. Furthermore, as damages suffered by class members may be relatively small, the expense and burden of individual litigation make it impossible for class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION
### (Violation of the Unfair Competition Law)

33.     Plaintiffs and the class members hereby repeat and reallege paragraphs 1 through 32 and incorporate same as though fully set forth herein.

*Third Amended Class Action Complaint*

34.     Business and Professions Code section 17200 et seq., the Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." The acts of Midland, as alleged herein, constitute unlawful, unfair and/or fraudulent business practices and unfair, deceptive, untrue or misleading advertising within the meaning of § 17200.

35.     Midland has violated the "fraudulent" prong of the UCL in two ways. With respect to the purported bonus, as stated above, Midland represented that a "bonus" was being provided while failing to reveal that this purported increase in the Accumulation Value would be offset by crediting lower returns each year, in essence, resulting in a trading of dollars. No bonus has been provided. The offering of a bonus was nothing more than a deceptive sales practice used by Midland to arm agents with an enticement to lure purchasers away from their existing investments with the promise that losses incurred from cashing out those investments would be offset by a Midland bonus. With respect to the high sales commissions, Midland represented that its annuities would serve as an asset accumulation vehicle that would provide growth "linked" to stock indexes, tax-deferred growth, and other benefits so as to allow purchasers to "achieve your goals for retirement." Midland failed to disclose and concealed, however, that it would undermine the products' asset-accumulation objective by paying high sales commissions to selling agents, a cost that would be shifted back to purchasers through lower returns.

36.     Plaintiff Vaccarino relied on these misrepresentations and omissions in purchasing her annuities. She purchased the annuities because of the bonus and purported higher returns as set forth in the sales brochure and disclosure statements. In furtherance thereof, she deposited $112,214.15 and $70,261.54 into two Midland "Bonus 11" annuities.

37.     Plaintiff Vaccarino did not learn of Midland's misrepresentations and concealments regarding its recouping practices on the bonus and high sales commissions until the time she retained present counsel on April 8, 2011. Ms. Vaccarino contacted attorney Ronald Marron in 2006 as a result of information she saw in the newspaper regarding Midland. Ms. Vaccarino did not retain Mr. Marron and did not learn of Midland's deceptive practices, outlined above, at that time. Mr. Marron later provided Ms. Vaccarino information regarding his practice, and with a copy of the settlement approval in the *Peterman* action in May of 2010, but Ms. Vaccarino has no recall of these matters and took no action with respect to them. Mr. Marron contacted Ms. Vaccarino in March of 2011 and Ms. Vaccarino retained counsel on April 8, 2011. Concurrent with the retention of counsel on or about April 8, 2011, Ms. Vaccarino formed the understanding and belief that Midland engaged in the practices outlined herein. Midland provided Ms. Vaccarino no information by which to learn of its recouping practices before that time. As set forth above, there is no information regading Midland's practices in its sales brochure, disclosure statement, or the contract. To the contrary, Midland represents that its rate-setting

practices are the result of its discretionary right under the contracts to set rates subject to the contractual minimum. Midland did not even disclose its practices to its selling agents. Moreover, there was no way for Plaintiff to analyze Midland's actions given the complex structure of the product, the indefinite "values" set forth in the contract, and the fact that Midland's recouping actions are designed and performed by its actuaries within its corporate walls and concealed from the public.

38.    Plaintiff Tegen relied on these misrepresentations and omissions in purchasing his annuity. He purchased the annuity because of the bonus and purported higher returns as set forth in the sales brochure and disclosure statements. In furtherance thereof, he deposited $46,270.22 into a Midland "Legacy Bonus 11" annuity.

39.    Plaintiff Tegen did not learn of Midland's misrepresentations and concealments regarding its recouping practices on the bonus and high sales commissions until the time he retained his present counsel on December 28, 2011. Mr. Tegen was referred to attorney Ronald Marron earlier that month by a stockbroker who Mr. Tegen had consulted regarding his stocks. The stockbroker learned that Mr. Tegen had a Midland annuity and referred him to Mr. Marron. Mr. Tegen then met with Mr. Marron in late December of 2011 and retained present counsel on December 28, 2011. Concurrent with the retention of counsel on or about December 28, 2011, Mr. Tegen formed the understanding and belief that Midland engaged in the practices outlined herein. Midland provided Mr. Tegen with no

information by which to learn of its recouping practices before that time. As set forth above, there is no information regading Midland's practices in its sales brochure, disclosure statement, or the contract. To the contrary, Midland respresents that its rate-setting practices are the result of its discretionary right under the contracts to set rates subject to the contractual minimum. Midland did not even disclose its practices to its selling agents. Moreover, there was no way for Plaintiff to analyze Midland's actions given the complex structure of the product, the indefinite "values" set forth in the contract, and the fact that Midland's recouping actions are designed and performed by its actuaries within its corporate walls and concealed from the public.

40.    Midland violated the "unfair" prong of the UCL by using an indecipherable formula called an "Interest Adjustment" to boost surrender penalties, as alleged herein. Additionally, the contract does not state that an Interest Adjustment will apply on partial surrender but Midland's applies an Interest Adjustment to any partial surrender that exceeds the 10% penalty free withdrawal amount.

41.    Midland violated the "unlawful" prong of the UCL with respect to the Subclass (purchasers ages 60 through 64) by violating Insurance Code section 10127.13, as alleged herein.

42.    As a result of Midland's unfair competition, Plaintiffs have suffered injuries in fact and have lost money or property, as have the other class members.

Vaccarino has received no bonus, as alleged herein, has received diminished returns due to the undisclosed high sales commissions, as alleged herein, has suffered the imposition of an illegal surrender charge, as alleged herein, and has suffered an increase in that charge via Midland's application of an illegal and unenforceable Interest Adjustment, as alleged herein. Tegen has received no bonus, as alleged herein, has received diminished returns due to the undisclosed high sales commissions, as alleged herein, and although Tegen has not surrendered his annuity, he remains subject to Midland's application of the annuity's illegal and unenforceable Interest Adjustment provision, as alleged herein.

43.     On behalf of themselves and on behalf of the general public, Plaintiffs and the class members respectfully request that the Court order Midland to provide restitution, and interest thereon, and enjoin Midland from committing the acts alleged herein in the future.

44.     Plaintiffs and the class members request attorneys' fees under Code of Civil Procedure section 1021.5 and/or under a common fund theory.

## SECOND CAUSE OF ACTION
### (Fraud)

45.     Plaintiffs and the class members hereby repeat and reallege paragraphs 1 through 44 and incorporate same as though fully set forth herein.

46.     As a proximate result of the representations and omissions of Midland, Plaintiffs and the class members have suffered loss of monies in a sum to be proven at the time of trial.

18

*Third Amended Class Action Complaint*

47.     The aforementioned acts were performed by Midland maliciously, fraudulently and oppressively entitling Plaintiffs and the class members to punitive damages in an amount appropriate to punish Midland.

48.     Plaintiffs and the class members request attorneys' fees under Code of Civil Procedure section 1021.5 and/or under a common fund theory.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

49.     Plaintiffs and the class members hereby repeat and reallege paragraphs 1 through 48 and incorporate the same as though fully set forth herein.

50.     Plaintiffs and the class members entered into written contracts with Midland, as alleged herein.

51.     The essential terms of the contracts were that Midland agreed to accept a premium from said purchasers, credit a "bonus" to the annuity's "Accumulation Value," credit returns annually under the annuities, and annuitize those monies upon request. Said purchasers, in return, agreed to pay a premium under the contracts.

52.     With respect to the promise of a bonus, Midland's annuity contracts state that a bonus will be applied to the to premium deposited into the annuity in accordance with the bonus percentage listed on the Specifications Page. The two "Bonus 11" annuities Midland sold to Vaccarino state on the Specifications Page that the bonus percentage is "11%" and show a "Premium Including Bonus" figure equal to the premium deposited and an additional 11%. The "Legacy Bonus 11" annuity sold to Tegen states on the Specifications Page that the bonus percentage is

19

"11%" and shows a "Premium Including Bonus" figure equal to the premium deposited and an additional 11%.

53.     As alleged herein, the bonus is not a true bonus. Midland recalculates and sets the rates marginally lower each year so as to recoup the cost of the bonus over the term of the contract's surrender period, thereby breaching its express and implied promises regarding the bonus.

54.     With respect to Midland's acts in recouping the cost of the high sales commissions by lowering returns, Midland created the objectively reasonable expectation on behalf of purchasers that their annuities would have an accumulation objective, that is, that the monies would grow over time. Midland used the sales brochures and disclosure statements to market the annuities as a retirement vehicle with an asset accumulation objective, representing that purchasers would enjoy growth "linked" to stock indexes, tax-deferred growth, and other benefits with no downside. Midland knew that agents wanted equity indexed annuities to sell so they could promote the product's purportedly high-growth potential to purchasers and earn the high commissions that could be hidden in the product's complex structure. Rather than provide purchasers with an investment vehicle that actually uses the principal invested to achieve returns, Midland actually reduces this investment asset by the high sales commissions paid the selling agents, directly undermining the accumulation objective Midland promotes.

55.     Midland breached its implied promise to credit returns consistent with the purchasers' objectively reasonable expectations, given the nature of the product and the statements made in Midland's sales brochures and disclosure statements, by reducing the annual returns, as alleged herein.

56.     Plaintiff Vaccarino did not learn of Midland's misrepresentations and concealments regarding its recouping practices on the bonus and high sales commissions until the time she retained present counsel on April 8, 2011. Ms. Vaccarino contacted attorney Ronald Marron in 2006 as a result of information she saw in the newspaper regarding Midland. Ms. Vaccarino did not retain Mr. Marron and did not learn of Midland's deceptive practices, outlined above, at that time. Mr. Marron later provided Ms. Vaccarino information regarding his practice, and with a copy of the settlement approval in the *Peterman* action in May of 2010, but Ms. Vaccarino has no recall of these matters and took no action with respect to them. Mr. Marron contacted Ms. Vaccarino in March of 2011 and Ms. Vaccarino retained counsel on April 8, 2011. Concurrent with the retention of counsel on or about April 8, 2011, Ms. Vaccarino formed the understanding and belief that Midland engaged in the practices outlined herein. Midland provided Ms. Vaccarino no information by which to learn of its recouping practices before that time. As set forth above, there is no information regading Midland's practices in its sales brochure, disclosure statement, or the contract. To the contrary, Midland represents that its rate-setting practices are the result of its discretionary right under the contracts to set rates

*Third Amended Class Action Complaint*

subject to the contractual minimum. Midland did not even disclose its practices to its selling agents. Moreover, there was no way for Vaccarino to analyze Midland's actions given the complex structure of the product, the indefinite "values" set forth in the contract, and the fact that Midland's recouping actions are designed and performed by its actuaries within its corporate walls and concealed from the public.

57.     Plaintiff Tegen did not learn of Midland's misrepresentations and concealments regarding its recouping practices on the bonus and high sales commissions until the time he retained his present counsel on December 28, 2011. Mr. Tegen was referred to attorney Ronald Marron earlier that month by a stockbroker who Mr. Tegen had consulted regarding his stocks. The stockbroker learned that Mr. Tegen had a Midland annuity and referred him to Mr. Marron. Mr. Tegen then met with Mr. Marron in late December of 2011 and retained present counsel on December 28, 2011. Concurrent with the retention of counsel on or about December 28, 2011, Mr. Tegen formed the understanding and belief that Midland engaged in the practices outlined herein. Midland provided Mr. Tegen with no information by which to learn of its recouping practices before that time. As set forth above, there is no information regarding Midland's practices in its sales brochure, disclosure statement, or the contract. To the contrary, Midland respresents that its rate-setting practices are the result of its discretionary right under the contracts to set rates subject to the contractual minimum. Midland did not even disclose its practices to its selling agents. Moreover, there was no way for Plaintiff

22

to analyze Midland's actions given the complex structure of the product, the indefinite "values" set forth in the contract, and the fact that Midland's recouping actions are designed and performed by its actuaries within its corporate walls and concealed from the public.

58.     With respect to Midland's imposition of an Interest Adjustment, Midland used this provision to boost surrender penalties even though the provision is incomprehensible and fails to adequately describe the nature and extent of this added penalty. The annuities do not actually state how the adjustment functions but, instead, set forth a three-variable fractional exponential formula which has a built-in bias towards loss of value, with rising, flat, or slightly fallen declared interest rates, all resulting in an increase in the surrender penalties.

59.     Because the Interest Adjustment is a penalty, it must be plain, clear and conspicuous to be enforceable. Midland's Interest Adjustment is wholly unintelligible and cannot be enforced. Despite this, Midland applied its Interest Adjustment to Vaccarino's surrender charges in connection with her partial surrender, as alleged herein, thereby breaching the contract. As a consequence of the application of that Interest Adjustment, Vaccarino suffered a loss. Additionally, the contract does not state that an Interest Adjustment will apply on partial surrender but Midland's applies an Interest Adjustment to any partial surrender that exceeds the 10% penalty free withdrawal amount.

*Third Amended Class Action Complaint*

60.  With respect to Midland's application of surrender charges, including the Interest Adjustment, to Vaccarino and other members of the Subclass (purchasers age 60 through 64), Midland failed to provide the warning required by Insurance Code section 10127.13 on the cover the annuities rendering any penalties unenforceable. Midland breached the contract when it applied a surrender penalty, including an Interest Adjustment, to Vaccarino's partial surrender, as alleged herein.

61.  As a proximate result of the aforementioned breaches of the contracts by Midland, Plaintiffs and the class members have suffered a loss of the monies and interest thereon in an amount to be proven at the time of trial.

62.  Plaintiffs and the class members request attorneys' fees under Code of Civil Procedure section 1021.5 and/or under a common fund theory.

## FOURTH CAUSE OF ACTION
### (Declaratory Relief)

63.  Plaintiffs and the class members hereby repeat and reallege paragraphs 1 through 62 and incorporate the same as though fully set forth herein.

64.  As alleged above, an actual controversy exists between the parties regarding their rights and liabilities under the contracts and the cited statute. Midland continues to perform the acts alleged herein, resulting in an ongoing controversy with ongoing damage to Plaintiffs and the class members.

65.  Plaintiffs and the class members request a declaration of the parties' rights and liabilities under the annuities.

*Third Amended Class Action Complaint*

66.     Plaintiffs and the class members request attorneys' fees under Code of Civil Procedure section 1021.5 and/or under a common fund theory.

**WHEREFORE, Plaintiffs and the class members pray for judgment against Midland as follows:**

1.     Restitution of the monies improperly collected or withheld;

2.     A preliminary and permanent injunction restraining Midland from further unfair practices;

3.     Special damages in a sum to be determined at the time of trial;

4.     A declaration of the rights and liabilities of the parties under the Midland deferred annuities;

5.     Reasonable attorneys' fees;

6.     Punitive damages in an amount appropriate to punish or set an example of Midland;

7.     Costs of suit incurred herein; and

8.     For such other and further relief as the Court deems just and proper.

DATED:  May 3, 2012                     GIANELLI & MORRIS
                                        LAW OFFICES OF RONALD A. MARRON


                                        By:
                                           ROBERT S. GIANELLI
                                           JULLY C. PAE
                                           LOTTE COLBERT
                                              Attorneys for Plaintiffs

*Third Amended Class Action Complaint*

# PROOF OF SERVICE

*Rosalie Vaccarino. v. Midland National Life., et al.*
*United States District Court–Central District of California, Case No. 2:11 CV-5858*

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action; my business address is 888 W. Sixth Street, 9th Floor, Los Angeles, CA 90017.

On May 3, 2012, I served the foregoing document described as THIRD AMENDED CLASS ACTION COMPLAINT FOR on the interested parties in this action by placing a true copy of the original thereof enclosed in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

**X     As Indicated on Service List, by Mail:**  I caused such envelope with postage thereon fully prepaid to be placed in the United States mail at Los Angeles, California.

**X     (FEDERAL)** I declare under penalty of perjury under the laws of the United States of America that I am employed in the office of a member of the bar of this court at whose direction the service was made.  Executed on May 3, 2012, at Los Angeles, California.

LETICIA MEJIA

**SERVICE LIST**
*Rosalie Vaccarino. v. Midland National LIfe., et al.*
*United States District Court–Central District of California, Case No. 2:11 CV-5858*

Ronald A. Marron
Malgorzata Realin
Law Offices Ronald A. Marron
3636 Fourth Ave., Suite 202
San Diego, CA 92103
Tel:  (619) 696-9006
Fax:  (619) 564-6665
ron@consumersadvocates.com
maggie@consumersadvocates.com

**CO-COUNSEL FOR PLAINTIFF:**
ROSALIE VACCARINO

Robert D. Phillips, Jr.
Kathy Huang
Reed Smith, LLP
355 South Grand Ave., Suite 2900
Los Angeles, CA 90071-1514
T (213) 457-8000
F (213) 457-8080
rphillips@reedsmith.com
khuang@reedsmith.com

**COUNSEL FOR DEFENDANTS:**
MIDLAND NATIONAL LIFE INSURANCE CO.

Terence Hawley
William Higgins
Reed Smith, LLP
101 Second Street Suite 1800
San Francisco, California 94105
T: (415) 543-8700; F:(415) 391-8269
thawley@reedsmith.com
whiggins@reedsmith.com