UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Laura Elias | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants |
|---|---|
| Joshua Davis | Kathy Huang |
| Robert Gianelli | Robert Phillips, Jr. |
| Ronald Marron | Terence Hawley |
| | William Higgins |

**Proceedings:**   PLAINTIFFS' RENEWED MOTION FOR CLASS
CERTIFICATION (dkt. 251, filed July 24, 2013)

DEFENDANT'S MOTION TO EXCLUDE THE
DECLARATION OF JEFFREY K. DELLINGER (dkt. 274, filed
September 5, 2013)

PLAINTIFFS' MOTION TO STRIKE MIDLAND'S REPLY
BRIEF (dkt. 371, filed January 6, 2014)

DEFENDANT'S MOTION TO STRIKE THE DECLARATION
OF STANLEY PRESSER (dkt. 372, filed January 6, 2014)

## I.      INTRODUCTION

On June 17, 2011, plaintiff Rosalie Vaccarino ("Vaccarino") filed this putative
class action against defendant Midland National Life Insurance Company ("defendant" or
"Midland") in the Los Angeles County Superior Court.  On June 15, 2011, defendant
removed the action to federal court.  The gravamen of Vaccarino's complaint is that
Midland made representations regarding premium bonuses and other benefits, while
failing to adequately disclose that the costs of bonuses and exorbitant agent commissions
would be imposed on purchasers, accompanied by unenforceable surrender charges and
interest adjustments.  Based on the foregoing, plaintiffs bring claims for violation of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

California Business and Professions Code § 17200, et seq. ("Unfair Competition Law" or "UCL"), fraud, breach of contract, and declaratory relief.

After several rounds of motion practice, plaintiff filed the operative Third Amended Complaint ("TAC") on May 3, 2012, and named David Lee Tegen as an additional plaintiff.

On September 24, 2012, plaintiffs moved to certify a class and a "senior subclass" comprised of:

> All California residents (persons, trusts, or entities) who purchased Bonus 5, Bonus 10, Bonus 11, Legacy Select, Legacy Bonus 5, Legacy Bonus 11, and Veridian Plus deferred annuities from Midland when they (or the annuitants) were age 64 or younger.

> All California residents (persons, trusts, or entities) who purchased Bonus 10, Bonus 11, Legacy Select, Legacy Bonus 5, Legacy Bonus 11, and Veridian Plus deferred annuities from Midland when they (or the annuitants) were ages 60 through 64.

See TAC ¶ 26 (as modified by dkt. 130 at 1 n.1). These seven annuity products are the "Class Products." The Court denied plaintiffs' motion for class certification without prejudice on June 17, 2013. Dkt. 239. The Court found that plaintiffs had satisfied all of the requirements of Fed. R. Civ. P. 23 except demonstrating a "plausible, classwide method of proving damages." Id. at 31.

On July 25, 2013, plaintiffs filed a renewed motion to certify the class. On September 4, 2013, Midland filed its opposition, and on November 4, 2013, plaintiffs replied. On February 3, 2014, the Court held a hearing. After considering the parties' arguments, the Court finds and concludes as follows.

## II. BACKGROUND

The background facts and the history of this litigation are well known to the parties, and are set forth in the Court's prior order on class certification. Dkt. 239.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|-------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

Because plaintiffs' renewed motion for class certification focuses on the measurement of damages, the Court briefly summarizes the financial basis of plaintiffs' allegations. This description is adopted from the more exhaustive discussion in the Court's prior order. <u>Id.</u>

Plaintiffs seek to recover for fraud, breach of contract, and unfair competition which allegedly took place in connection with seven fixed and index annuities sold by Midland. These annuities are investments that offer purchasers a certain rate of return, known as the "credited rate." For fixed annuities, this credited rate is guaranteed for the first year of the policy, and then set at a "renewal" rate in subsequent policy years. For index annuities, the credited rate is linked to the performance of certain stock market indices. For both fixed and index annuities, Midland guaranteed a minimum credited rate in the annuity contract. As a practical matter, Midland is able to pay annuity holders the credited rate by pooling together the accumulated value of the annuities it has sold, and investing those funds in various other investment products. Midland's investments generate a return, and Midland then passes a portion of this investment return on to annuity holders in the form of the credited rate on their annuities.

Midland designs its annuity products so that the anticipated rate of return that Midland expects to receive on its investments is greater than the credited rate passed on to annuity holders. The difference between Midland's anticipated rate of return on its investment and the credited rate passed on to annuity holders is called the "target spread." To illustrate with a simplified hypothetical example, in a given year Midland may anticipate receiving a 5% rate of return on its investments. If Midland sells annuity products with a 4% credited rate, the target spread would be 1%—the difference between the 5% Midland receives on its investments and the 4% it credits to annuity holders. Midland retains this 1% as revenue.

The gravamen of plaintiffs' allegations regarding bonuses and commissions is that Midland improperly inflated the spread in order to recoup the upfront costs associated with paying out commissions and premium bonuses. By inflating the spread, plaintiffs allege, Midland depressed the credited rate received by the plaintiffs and retained additional investment returns for itself. Returning to the simplified hypothetical above, plaintiffs' contentions allege, in effect, that Midland recouped the commissions and bonus by inflating the spread from 1% to 1.5%. Under this scenario, if Midland subsequently earns a 5% rate of return on its investment, plaintiffs only receive a 3.5%

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|--------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

credited rate on their annuities, rather than the 4% credited rate to which plaintiffs allege they were entitled. Midland, conversely, retains an additional .5% return that plaintiffs allege it is not entitled to; this additional .5% return is how Midland recoups the upfront costs associated with commissions and premium bonuses.

Plaintiffs also contend that Midland improperly deducted a surrender charge from any withdrawals in excess of 10% of the annuities' accumulated value. These penalties applied to withdrawals that occurred before Midland had recovered its unamortized costs. Additionally, the annuities charged an "interest adjustment" to purchasers who surrendered or partially surrendered their annuity. For the subclass of purchasers who were age 60 to 64 at the time of purchase, plaintiffs contend that these penalties were impermissibly applied in violation of California Insurance Code § 10127.13, which requires surrender penalty information to be disclosed on the cover of any annuity product.

## III.  LEGAL STANDARD

"Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect rights of persons who might not be able to present claims on an individual basis." Haley v. Medtronic, Inc., 169 F.R.D. 643, 647 (C.D. Cal. 1996) (citing Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983)). Federal Rule of Civil Procedure 23 governs class actions. For a suit to be maintained as a class action, the proposed class must "satisfy the criteria set forth in subdivision (a). . . , and it also must fit into one of three categories described in subdivision (b)." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., — U.S. —, 130 S. Ct. 1431, 1437 (2010).

More than a pleading standard, Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the rule." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. —, —, 131 S. Ct. 2541, 2551 (2011). This requires a district court to conduct "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." Id. However, the Supreme Court has strongly cautioned that "merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

class certification are satisfied." Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1195 (2013).

First, plaintiffs must demonstrate that the four requirements of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. These requirements effectively "limit the class claims to those fairly encompassed by the named plaintiff's claims." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v. Yamasaki, 442, U.S. 682, 701 (1979)).

Second, if a court finds that the Rule 23(a) requirements are met, the court must consider whether the class is maintainable under one of the three alternatives set forth in Rule 23(b). Dukes, 131 S. Ct. at 2548. Plaintiffs here seek to maintain certification under Rule 23(b)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (citing Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)). If "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then adjudication on a representative basis is appropriate. Id. Otherwise, individualized adjudication is more appropriate. Therefore, the Court must balance concerns regarding the litigation of issues common to the class as a whole with questions affecting individual class members. In re N.D. Cal., Dalkon Shield IUD Products Liability Litig., 693 F.2d 847, 856 (9th Cir. 1982).

In determining superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests that members in the class have in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigations concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely encountered in the management of a class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

action.  See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190–1193, (9th Cir. 2001) (opinion amended on denial of reh'g, 273 F.3d 1261).

## IV.   DISCUSSION

### A. Threshold Matters

Before the Court reaches the merits of plaintiffs' renewed motion for class certification, the Court first addresses a number of associated issues that have arisen in connection with plaintiffs' motion.  First, in this Court's prior order denying class certification, the Court found that plaintiffs had demonstrated all of the Rule 23 requirements for certification with regard to liability.  Dkt. 239 at 31.  Despite this, the Court also found that plaintiffs had failed to "offer a plausible classwide method of proving damages" and directed plaintiffs to address these issues on a renewed motion for class certification.  Id.  Despite this focus on damages, Midland's opposition to plaintiffs' renewed motion for class certification nonetheless attempts to relitigate class certification as it pertains to liability.  See, e.g., Opp. 16.  These arguments and supporting evidence consist primarily of (1) additional evidence that individual sales agents discussed the features of the annuities with particular class members, (2) survey evidence concerning the experience of class members, and (3) further discovery concerning the statute of limitations   The Court has examined these arguments and evidences, and has concluded that they do not require revisiting the Court's prior ruling on certification as to liability.

Second, both parties have filed a number of additional motions to strike or exclude various materials filed in support of or in opposition to class certification.  On September 5, 2013, Midland filed a motion to strike the declaration of plaintiffs' expert Jeffrey K. Dellinger.  Dkt. 274.  As discussed below, Dellinger is plaintiffs' primary expert on the question of calculating damages.  Subsequently, on January 6, 2014, plaintiffs filed a motion to strike Midland's reply brief on Midland's motion to exclude the declaration of Dellinger.  Dkt. 371.  Plaintiffs contend that Midland's reply brief is, in reality, an unauthorized surreply to their motion for class certification.  Also on January 6, 2014, Midland filed a motion to strike the declaration of Stanley Presser, an expert for plaintiffs who respond to certain survey evidence proffered by Midland in opposition to class certification.  Dkt. 372.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|-------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

On January 14, 2014, the Court issued a minute order expressly directing the parties to not file any additional submissions regarding plaintiffs' renewed motion for class certification. Dkt. 381. The parties are reminded of their obligation to comply with the Local Rules governing procedures for briefing. The parties are particularly directed to review the Notice to Counsel, posted to the docket on August 1, 2011, which specifically addresses the conduct at issue here.[1] See dkt. 20 ¶ 2 ("Counsel are admonished not to circumvent page limits by filing multiple motions which purport to address separate issues in a case.").

The Court has also reviewed the various motions to strike or exclude, and concludes that they should all be denied. Beginning with Midland's motion to strike the declaration of Jeffrey Dellinger, the Court has determined that it is primarily addressed to issues of class certification, rather than the admissibility of Dellinger's expert opinion. See, e.g., dkt. 274 at 10 ("Dellinger's Proposal Does Not State A Measure of Damages That 'Fits' With Plaintiffs' Legal Theories."). In particular, Midland's motion to exclude focuses on the legal merits of plaintiffs' claims, rather than whether Dellinger's declaration is based on inadmissible "junk science." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011). Accordingly, the Court will consider Midland's arguments as they bear on the subject of class certification.

To the extent that Midland's motion to exclude bears on subjects other than whether the model offered by Dellinger satisfies plaintiffs' burden under Rule 23, the motion is hereby DENIED. Expert testimony is admissible if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods;" and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court has reviewed Dellinger's declaration, and concluded that it satisfies

---

[1] The Court notes that this is not the first time that Midland has filed additional motions to supplement its arguments in opposition to class certification. See, e.g., dkt. 239 at 2 n.1 (concluding that "much of defendant's ex parte application, however, is a sur-reply rather than an application to strike 'scandalous' or 'impertinent' material.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|-------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

the requirements set forth by Fed. R. Evid. 702 and <u>Daubert</u>. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." <u>Primiano v. Cook</u>, 598 F.3d 558, 564 (9th Cir. 2010) (citing <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 594 (1993)).

Conversely, although plaintiffs are correct that much of Midland's reply in support of its motion to exclude the declaration of Dellinger is in fact a surreply in opposition to plaintiffs' renewed motion for class certification, the Court exercises its discretion to consider the arguments contained in Midland's reply and therefore DENIES plaintiffs' motion to strike. Similarly, the Court DENIES as moot Midland's motion to exclude the declaration of Stanley Presser. Mr. Presser's declaration responds to evidence offered by Midland in its arguments bearing on certification of liability issues, rather than damages. Because the Court declines to revisit certification of liability issues, it does not consider either Midland's evidence or Mr. Presser's response to this evidence.

Lastly, both parties file numerous evidentiary objections. Dkts. 287, 312. Many of these objections pertain to evidence not relied upon by the Court, and are therefore OVERRULED as moot. The balance of the objections appear to reiterate the parties' substantive arguments regarding class certification, rather than object to inadmissible evidence. These objections are OVERRULED for the reasons stated herein.

**B. Plaintiffs' Bonus/Commission Damages Model**

The Court previously denied class certification because plaintiffs had failed to "offer a damages model that tethers their theory of liability to the injuries allegedly suffered by each class member." Dkt. 239 at 31; <u>see</u> <u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1435 (2013) ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." (quotations omitted)). Plaintiffs now renew their motion for class certification by proffering a damages model that, they contend, remedies the deficiencies set forth in this Court's previous order. To explain this model, plaintiffs offer the declaration of their damages expert Jeffrey K. Dellinger. <u>See</u> Dellinger Decl.

In determining whether plaintiffs have satisfied the requirements of Rule 23, the Court begins with plaintiffs' claims that Midland improperly recouped bonuses and sales

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

commissions by decreasing the credited rate that accrued to policy-holder's annuities. Plaintiffs assert that this improper recoupment constituted breach of contract, fraud, and a violation of the UCL. Plaintiffs' claim for breach of contract alleges (1) that Midland breached the annuity contracts' bonus provisions by recouping the bonus through lower credited rates, TAC ¶ 53, and (2) that Midland breached its implied promise to credit returns consistent with the "growth" objective of the annuity products by reducing annual returns to recoup the high sales commissions paid to salespeople, TAC ¶¶ 54-55. Plaintiffs' claims for fraud and violation of the UCL similarly contend that Midland represented to prospective purchasers that Midland annuities paid an upfront bonus and offered strong growth, and that these representations were false because the bonus and high sales commissions were recouped through lower credited rates. TAC ¶¶ 14, 17, 35.

As explained in this Court's previous order, plaintiffs' damages model must tether these three legal theories to a calculation of the damages available under each theory. Dkt. 239 at 22-23. Here, the damages model proposed by Dellinger would involve a two-step procedure for the calculation of plaintiffs' damages. Dellinger Decl. ¶ 9. First, plaintiffs would determine the lower spread that would result "if the product were otherwise identical," but the spread was reduced to remove what plaintiffs allege was improper inflation. Id. Plaintiffs assert that, when designing annuities, Midland routinely calculated the additional spread required to recoup a given level of premium bonus or sales commission. Dellinger offers by way of example Midland's appraisal of the spread needed to recoup the premium bonus associated with the Veridian Plus annuity. Id. ¶ 14 n.4. In this instance, Midland calculated that recouping the costs associated with increasing the Veridian Plus premium bonus from 10% to 12.5% would require inflating the spread by 0.36%. Supp. App. Exs., Ex. 1, at 72 (Exhibit attached to Yanacheak Deposition). Similarly, Midland calculated that a 1 percentage point change in the commissions paid out on the Legacy Select annuity corresponds to a 0.12% change in the spread. Id. ex. 4. In both cases, the first step of plaintiffs' damages model would calculate how much the spread was increased by these inflated charges.

As a practical matter, plaintiffs assert that this recalculation could be easily accomplished using Midland's own pricing software and records, as Midland used this software and data to calculate the inflated spreads in the first place. Dellinger Decl. ¶¶ 13–15; see also dkt. 239 at 22 (noting that "the fact that Midland maintains extensive data on its purchasers' accounts, and that credited rates are determined through actuarial

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

software that accounts for Midland's costs (including the bonus and commissions), will assist plaintiffs in presenting evidence of damages"); Leyva v. Medline Indus. Inc., 716 F.3d 510, 515 (9th Cir. 2013) (finding that damages in a wage and hour action could be easily calculated "[t]hrough a query of the computerized timekeeping database" operated by the defendant).

The second step of plaintiffs' damages model would convert the inflation of the spread into a dollar figure.  For each policy year, the second step of the proposed damages model would multiply the inflation in the spread by the accumulated value of the annuity at the beginning of that policy year.  Dellinger Decl. ¶¶ 16–18.  This calculation would yield the additional return the annuity would have received in the absence of the improper spread inflation.  Dellinger illustrates this calculation with the following example: if the first step of plaintiffs' damages model showed that Midland inflated the spread by 2%, and the accumulated value of a particular annuity at the beginning of a given policy year was $22,200, then the second step of plaintiffs' damages model would calculate that the annuity was entitled to an additional $444 dollars in return for that policy year.[2]  Id. ¶ 18.  The damages model performs the same calculation for each policy year, converts each year's damages into present value, and totals the damages over all policy years to produce the total damages incurred for each annuity.  Id. ¶ 20.

Plaintiff assert that this two-step calculation translates their legal theory of liability into a measurement of the harm caused by Midland's alleged wrongdoing.  Cf. Comcast Corp. v. Behrend, 133 S. Ct. at 1435 ("'The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.'" (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).  Midland contests this conclusion on two grounds.  First,  it argues that the damages model does not actually correspond to plaintiffs' three theories of liability.  Second, it contests the factual accuracy of plaintiffs' damages model.  The Court addresses each of these arguments in turn.

---

[2] Specifically, 2% multiplied by $22,200 yields $444.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

1. Connection to Theories of Liability

        Midland argues that plaintiffs have not sufficiently "tied" their damages model to the theories of legal liability asserted in the complaint.  Midland particularly objects that plaintiffs assert three theories of legal liability, but only offer one model of damages.  In doing so, Midland argues, plaintiffs make the same mistake as the plaintiffs in <u>Comcast</u>, who proposed one model of damages to cover four theories of antitrust violation. <u>Comcast</u>, 133 S. Ct. at 1430.

        To begin, this argument misreads <u>Comcast</u>.  In <u>Comcast</u>, the plaintiffs advanced four separate theories of antitrust violation, which collectively resulted in subscribers overpaying for cable TV service.  <u>Id.</u>  The district court only accepted one of these four theories as susceptible of classwide proof.  The plaintiffs' method of computing damages, however, did not segregate out the harm caused by each of the four theories of antitrust violation proffered by the plaintiffs.  <u>Id.</u> at 1433.  The Supreme Court found that this damages model did not satisfy the requirements of Rule 23(b)(3) because it conflated all four theories of antitrust violation without differentiating between the harms caused by each theory.  As Justice Scalia explained:

> For all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (a theory of liability that is not capable of classwide proof); while subscribers in Camden County may have paid elevated prices because of petitioners' increased bargaining power vis-à-vis content providers (another theory that is not capable of classwide proof); while yet other subscribers in Montgomery County may have paid rates produced by the combined effects of multiple forms of alleged antitrust harm; and so on.

<u>Comcast</u>, 133 S. Ct. at 1434 (2013).  Critically, separating out the damages attributable to the one theory of antitrust violation susceptible of classwide proof from the damages attributable to the three other theories could require an individualized, subscriber-by-subscriber analysis.  <u>Id.</u> at 1435.  The prospect of this individualized analysis, in turn, precluded class certification.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

Here, by contrast, all three of plaintiffs' theories assert the same underlying harm: Midland's alleged inflation of the spread to recoup bonuses and commissions. See Jacob v. Duane Reade, Inc., 293 F.R.D. 578, 592 (S.D.N.Y. 2013) ("Thus, unlike in Comcast, the injury here—lack of overtime—clearly stems from one, common harm."). Indeed, were plaintiffs to seek additional damages based on their multiple claims for fraud, breach of contract, and unfair competition, that would almost certainly constitute an improper double recovery. See, e.g., Ross v. Ross, 2002 WL 1824959, at *2 (Cal. Ct. App. Aug. 8, 2002) ("[T]he contract and fraud causes of action in her complaint are essentially based on the same facts . . . . [R]ecovery is thus 'limited by the rule against double recovery.'" (quoting Lazar v. Superior Court, 12 Cal. 4th 631, 649 (1996))). Because all three claims assert the same underlying harm, there is therefore no risk that the Court will be forced to "divy up" damages between claims on an individual basis. Cf. Comcast, 133 S.Ct. at 1434-1435 ("The permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless.").

Nonetheless, while plaintiffs' model is not flawed for the reasons that precluded certification in Comcast, the Court finds that certification is only appropriate as to plaintiffs' claim for breach of contract.[3] In particular, plaintiffs' damages model determines damages under a "benefit-of-the-bargain" measure of damages. The model calculates the difference between what plaintiffs expected to receive (an annuity growing at a higher credited rate) and what they actually received (an annuity growing at a lower rate due to the allegedly improper deductions). In other words, the model measures the damages "required to put [plaintiffs] in as good a position as [they] would have been if [Midland] had performed as promised." Judicial Council Of California Civil Jury Instruction 350. These expectation damages are a correct measure of damages on a contract claim. See, e.g., Restatement (Second) of Contracts § 347 (1981) ("Contract

---

[3] At the hearing on February 3, 2014, Midland argued that the class definition should be altered to limit the class to purchasers with claims that fall within the four year statute of limitations on contract claims. This argument reflects a misreading of the Court's June 28, 2012 order on Midland's third motion to dismiss, which found that tolling of the statute of limitations due to delayed discovery was available in this case. See dkt. 105; see also El Pollo Loco, Inc. v. Hashim, 316 F.3d 1032, 1040 (9th Cir. 2003) (applying delayed discovery rule to contract claim).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.").

Accordingly, the Court concludes that plaintiffs have sufficiently tied their legal theory of breach of contract to the damages model proffered by Dellinger. As explained above, the gravamen of plaintiffs' theory of breach of contract is that Midland promised to offer an upfront bonus and growth, and breached this promise by lowering the credited rate to recoup the bonus and commissions. Midland, plaintiff contends, thus deprived plaintiffs' annuities of the value they would have accrued from the promised lower spread. Under this contract theory, the correct measure of damages would award plaintiffs the benefit of their bargain: the extra value that would have accrued to their annuity had Midland not improperly lowered the credit rate.

Here, plaintiffs' proposed damage model does just that. The model appraises the additional spread that corresponds to the alleged improper recoupment of the bonuses and commissions. It then determines what the credited rate on each annuity would have been in the absence of that recoupment—i.e., what the credited rate would have been if Midland had complied with their alleged contractual obligations. Dellinger Decl. ¶ 9. Finally, the model calculates the additional dollar amount that would have accrued to plaintiffs' annuities if plaintiffs had received this credited rate. Id. ¶¶ 16-18. Because this calculation awards plaintiffs the benefit of their alleged bargain with Midland, the Court concludes that plaintiffs have met their burden of "tether[ing] their theory of [breach of contract] to the damages suffered by each class member" as a result of the alleged breach. Dkt. 239 at 23; see also Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013) ("[I]f putative class members prove [Midland's] liability, damages will be calculated based on the [amount] each lost due to [Midland's] unlawful practices.").

The same cannot be said for plaintiffs' claims for fraud and violation of the UCL. Specifically, California law does not permit the recovery of benefit-of-the-bargain damages for fraud or for violations of the UCL. With respect to fraud, Cal. Civ. Code § 3343(b)(1) specifically provides that victims of fraud may not "recover any amount measured by the difference between the value of property as represented and the actual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    0

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

value thereof."  Instead, fraud damages are computed on an "out-of-pocket" basis:  "The
difference between the actual value of that with which the defrauded person parted and
the actual value of that which he received."[4]  <u>Id.</u> § 3343(a); <u>see also</u> <u>Christiansen v.</u>

---

[4] Plaintiffs argue that they are permitted to recover benefit-of-the-bargain damages
because they fall within the exception set forth by Cal. Civ. Code § 3343(a)(4), which
authorizes the recovery of "an amount which will compensate him for any loss of profits
or other gains which were reasonably anticipated and would have been earned by him
from the use or sale of the property had it possessed the characteristics fraudulently
attributed to it by the party committing the fraud" when

> the defrauded party has been induced by reason of the fraud to purchase
> . . . property . . . provided that lost profits from the use or sale of the
> property shall be recoverable only if and only to the extent that all of the
> following apply:
>
> (i) The defrauded party acquired the property for the purpose of using or
> reselling it for a profit.
>
> (ii) The defrauded party reasonably relied on the fraud in entering into
> the transaction and in anticipating profits from the subsequent use or sale
> of the property.
>
> (iii) Any loss of profits for which damages are sought under this
> paragraph have been proximately caused by the fraud and the defrauded
> party's reliance on it.

<u>Id.</u>  The Court, however, finds that this exception does not apply because plaintiffs have
not shown that they "acquired the property for purpose of using or reselling it for a
profit."  In particular, the case cited by plaintiffs, <u>Stout v. Turney</u>, 22 Cal. 3d 718 (1978),
concerned the purchase of a mobile home park, where the seller misrepresented the
capacity of the park's sewage system.  <u>Stout</u> found that subsection (a)(4) applied because
the buyer had acquired the park "for the purpose of using . . . it."  Here, by contrast,
plaintiffs acquired Midland annuities, not as property to be worked, but rather as long-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|-------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

Roddy, 186 Cal. App. 3d 780, 790 (1986) ("The proper measure of tort damages is the 'out-of-pocket' measure; successful tort plaintiffs are not entitled to have damages computed on a contract, or 'benefit-of-the-bargain,' theory.").

The UCL similarly does not permit recovery of benefit-of-the-bargain damages. "While the scope of conduct covered by the UCL is broad, its remedies are limited. A UCL action is equitable in nature; damages cannot be recovered." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003) (citations omitted). Instead, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution."[5] Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 179 (1999). "[A]n order for restitution is one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those

_____

term investments. Were the Court to construe the phrase "using or reselling it for profit" broadly enough to encompass the annuities at issue here, the subsection (a)(4) exception would swallow the general rule that victims of fraud are not entitled to expectation damages.

[5] At the hearing on February 3, 2014, the Court inquired about whether a class could be certified for purposes of seeking injunctive relief under the UCL. Plaintiffs responded that certification would be appropriate because injunctive relief would not require individualized calculations of restitution. Midland responded that fashioning injunctive relief to preclude recoupment going forward would implicitly require regulating Midland's power to set credited rate, and that plaintiffs' had not offered proof that such regulation was feasible. After considering the parties' arguments, the Court concludes that certifying a class seeking injunctive relief under the UCL would not be appropriate, as plaintiffs have not met their burden of showing that constructing appropriate injunctive relief would not devolve into individualized inquiries. See Dukes, 131 S. Ct. at 2551 (2011) (noting that party seeking certification must "affirmatively demonstrate . . . compliance with" Rule 23).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

claiming through that person.'" Korea Supply Co., 29 Cal. 4th at 1149 (citing Kraus v. Trinity Management Services, Inc., 23 Cal. 4th 116, 126-27 (2000)).[6]

Accordingly, plaintiffs' recovery under their fraud and UCL claims would turn not on what plaintiffs expected to receive as the benefit of their bargain with Midland, but rather on (1) what they parted with when purchasing the annuities, and (2) what they received in exchange. Plaintiffs may recover on these claims only to the extent that the annuities they received were worth less than the amount they paid for those annuities. Put differently, even assuming plaintiffs are correct that Midland's annuities were not as valuable as Midland promised, plaintiffs cannot recover on their fraud and UCL claims if the annuities are worth what the plaintiffs' paid for them. If one pays $10 for a $10 watch, one cannot recover for fraud (or, alternatively, unfair competition), even if the seller represented that the watch was worth $15.

Crucially, plaintiffs' damages model here does not compare what the annuities were worth to what plaintiffs paid. Indeed, plaintiffs' model does not involve any valuation of what the annuities are "worth." Instead, as explained above, plaintiffs' model focuses entirely on the difference between what plaintiffs' claim they should have

_____

[6] Plaintiffs resist this conclusion, citing Fletcher v. Sec. Pac. Nat'l Bank, 23 Cal. 3d 442, 448 (1979), in which bank customers challenged the method by which interest was calculated on their savings account. Applying the UCL, the California Supreme Court upheld a trial court's order for restitution of the additional interest that plaintiffs should have received. As Korea Supply Co. explained, however, Fletcher stands only for the proposition that the "restitutionary form of disgorgement" is available under the UCL—the California Supreme Court " has never approved of nonrestitutionary disgorgement of profits as a remedy under the UCL." Korea Supply Co., 29 Cal. 4th at 1148 (emphasis added). "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." Id. at 1149. Here, for the reasons discussed below, plaintiffs' damages model does not purport to measure the amount required to restore the status quo that existed before plaintiffs purchased their annuities. Instead, the model calculates the amount that plaintiffs claim they would have received had Midland performed as promised.      As such, the Court finds Fletcher inapposite to the UCL claim at issue here.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

received and what they actually received.  The contrast to <u>Negrete v. Allianz Life Ins. Co. of N. Am.</u>, 287 F.R.D. 590 (C.D. Cal. 2012), is instructive.  In that case, the plaintiffs proffered "expert testimony that Allianz annuities are worth less than what class members paid for them at the moment of purchase." <u>Id.</u> at 613.  Such testimony could support an award for out-of-pocket damages, or for restitution.  Here, by contrast, Dellinger's model does not purport to show that the annuities are worth less than what plaintiffs' paid for them.  At most, the model shows that Midland annuities are not worth as much as Midland represented they were worth.  Accordingly, while plaintiffs' model may suffice to support plaintiffs' claim for breach of contract, it does not match up with the measures of recovery available for fraud, or under the UCL.

This is not to say that plaintiffs did not suffer out-of-pocket losses, or that they are not entitled to restitution.  It may well be true that Midland annuities are worth less than what plaintiffs paid for them.  But in the absence of a model demonstrating that plaintiffs' out-of-pocket losses are susceptible of measurement on a classwide basis, the Court concludes that certification of these claims would be inappropriate.

2. Factual Accuracy of Damages Model

In addition to contesting the legal basis of plaintiffs' damages model, Midland also identifies a number of alleged factual flaws in plaintiffs' model.  These flaws, according to Midland, lead the model to overstate the benefit-of-the-bargain damages allegedly incurred by plaintiffs.  First, Midland contends that plaintiffs' model does not account for a phenomenon known as "spread compression."  Spread compression occurs when Midland receives an unusually low rate of return on its investment portfolio.  Weinsier Decl. ¶ 25. Because the annuity contracts guarantee a certain minimum credited rate, there may not be enough of a gap between Midland's investment return and the guaranteed credited rate for Midland to receive its desired spread.[7]  Midland argues that

---

[7] Midland offers the following example: assume a 3% guaranteed minium credit rate, and a 2.5% spread.  If Midland only earns a 4.75% return on its investments, then it can receive a maximum spread of 1.75% because of the 3% minimum credit rate.  The low rate of return on Midland's investments has "compressed" the spread from 2.5% to 1.75%.  <u>See</u> Weinsier Decl. ¶ 25.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|-------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

plaintiffs' model assumes that Midland always receives the desired spread, and thus overstates the effect of the allegedly improper spread inflation. Id. ¶ 27.

Second, Midland argues that actual spread earned by Midland routinely deviated from Midland's anticipated spread. Midland represents that it used business judgment to regularly tweak spreads in response to competition, market environment, and other factors. As a result, Midland contends that plaintiffs' model, which again assumes that Midland always received the designed spread, misstates the amount actually recouped by Midland at the expense of plaintiffs.

Third, Midland argues that plaintiffs' model does not properly account for other, second-order changes to Midland's pricing policy that would occur in the absence of the allegedly improper inflation. In the words of Midland's expert David J. Weinsier, "[i]n order to accurately quantify the impact of 'alternative' target spreads on actual policy values, one would be forced to speculate as to how Midland would have set 'alternative' credited rates" in the counterfactual scenario where Midland had not inflated the spread. Weinsier Decl. ¶ 24.

Lastly, Midland argues that plaintiffs' model does not account for the fact that, in many Midland annuities, the annuity contract explicitly disclosed the credited rate that would accrue during the first policy year. Midland contends that this disclosure precludes any benefit-of-the-bargain damages for the first policy year.

For all these reasons, Midland contends that plaintiffs have not met their burden under Comcast to translate their "legal theory of the harmful event into an analysis of the economic impact of that event." Comcast, 133 S. Ct. at 1435 (quotation omitted). The Court, however, finds that these issues do not preclude certification of plaintiffs' claim for breach of contract. The Court begins by noting that, under California law, plaintiffs are required to, at most, provide a reasonable estimate of their damages. Because the class action is a procedural vehicle for the vindication of underlying rights, the damages that each class member is entitled to is ultimately a function of other substantive law. 28 U.S.C. § 2072 (providing that federal rules of procedure "shall not abridge, enlarge or modify any substantive right"). As such, plaintiffs' damages model need only calculate damages as accurately as required by California law—Comcast did not authorize federal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|-------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

courts to rewrite state substantive laws of damages.  Here, California "law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."  GHK Associates v. Mayer Grp., Inc., 224 Cal. App. 3d 856, 873 (1990); see also Dallman Co. v. S. Heater Co., 262 Cal. App. 2d 582, 594 (1968) ("The law only requires that the best evidence be adduced of which the nature of the case is capable . . . and the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision.").  Accordingly, to the extent the asserted flaws identified by Midland would not prevent recovery of damages under California law by an individual plaintiff asserting the same claims, those flaws do not defeat class certification.

More fundamentally, however, Comcast requires that courts determine whether damages are susceptible of classwide measurement, not whether that measurement is precisely correct.  Comcast itself illustrates the flaw in Midland's arguments.  As discussed above, the damages model advanced in Comcast did not differentiate between the harms caused by each of the four forms of antitrust violation asserted by the plaintiffs.  Id. at 1433.  Accordingly, even if the Comcast plaintiffs were entirely successful on the merits with respect to the single remaining theory of antitrust violation, their damages model could still overstate damages because it incorporated damages attributable to the other three, invalid theories of antitrust violation.  As the Supreme Court explained: "Prices whose level above what an expert deems 'competitive' has been caused by factors unrelated to an accepted theory of antitrust harm are not 'anticompetitive' in any sense relevant here." Id. at 1435.

Crucially, this flaw prevented class certification in Comcast because it undermined the plaintiffs' efforts to show that individual issues would not predominate.  An adequate damages model authorizes class certification when it provides assurance that determining damages will not "require labyrinthine individual calculations." Id. at 1434 (quotation omitted).  But "such assurance is not provided by a methodology that identifies damages that are not the result of the wrong." Id.

That is not the situation we have here.  None of the asserted flaws advanced by Midland show that benefit-of-the-bargain damages are not susceptible of classwide measurement.  At most, they are disagreements about what that measurement should be:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|--------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

Midland, for instance, proposes that the model should account for spread compression, while plaintiffs respond that Midland has not produced any evidence indicating that the Class Products ever suffered from spread compression. But the question of whether plaintiffs or Midland are correct is a question for the merits, not a question of whether "damages are susceptible of measurement across the entire class." Comcast, 133 S. Ct. at 1433. And class certification only "requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." In re Cathode Ray Tube (CRT) Antitrust Litig., 2013 WL 5429718, at *7 (N.D. Cal. June 20, 2013).

Midland relies heavily on the Supreme Court's admonition in Comcast that "our cases requiring a determination that Rule 23 is satisfied, even when that requires inquiry into the merits of the claim," Comcast, 133 S. Ct. at 1433, and that district "courts must conduct a 'rigorous analysis' to determine whether" plaintiffs' damages model is consistent with its theory of liability. Id. (quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011)). But the Supreme Court's instruction that courts are not barred from considering the merits when deciding class certification does not mean, as Midland seems to assert, that courts must decide the entirety of the merits in order to certify a class. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 133 S. Ct. at 1194-95.

In light of this admonition, the Court declines Midland's invitation to engage in a "free-ranging merits inquir[y]"—an inquiry that would require this Court to, in effect, fully adjudicate the substance of plaintiffs' allegations. Instead, the Court concludes that plaintiffs have adequately demonstrated that their damages model adequately translates their theory of inflated spreads into a classwide calculation of benefit-of-the-bargain damages calculation. In particular, the Court finds that plaintiffs' damages model, unlike the damages model in Comcast, does not measure damages "unrelated," Comcast, 133 S. Ct. at 1435, to plaintiffs' claim for breach of contract. If plaintiffs prevail on their claims that Midland improperly recouped the bonuses and commission payments, then the model will properly measure plaintiffs' benefit-of-the-bargain damages. Cf. Leyva 716 F.3d at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA                    O

## CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|---|---|---|---|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

514 (concluding that "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated").

Moreover, the damages model proposed by plaintiff is capable of modification should Midland demonstrate, through cross-examination or other means, that such modification is required.[8] Dellinger, for instance, outlines how the damages model could be modified to account for spread compression. See Supp. Dellinger Decl. ¶ 9. As discussed above, however, the Court need not reach the question of whether those modifications are required before certifying the class. Accordingly, the Court concludes that, even assuming Midland's contentions regarding spread compression and other factors are correct, those contentions do not show that individual issues predominate with respect to plaintiffs' claim for breach of contract. See, e.g., Amgen, 133 S. Ct. at 1197.

### C. Surrender Charges

Plaintiffs also seek to (1) certify the class with respect to their claims that Midland improperly deducted interest adjustments from surrendering policyholders, and (2) certify the senior subclass with respect to their claim that Midland did not disclose the surrender penalty in violation of Cal. Insurance Code § 10127.13. Plaintiffs contend that, unlike

---

[8] In this regard, the Court is particularly unpersuaded by Midland's contention that plaintiffs' damages model is "unfinished." Dkt. 274 at 19. Even accepting Midland's characterization as true, this case is also "unfinished": numerous legal and factual issues remain to be resolved, either through summary judgment or at trial. The resolution of these disputes will necessarily imply further adjustment and modification of any damages model. The only way that the Court could feasibly require plaintiffs to proffer a "finished" damages model would be to fully adjudicate the merits of the case as a predicate to class certification. But this Court declines to "put the cart before the horse." Amgen, 133 S. Ct. at 1191 (explaining that "the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently'").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA          O

### CIVIL MINUTES - GENERAL

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|--------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

their claims for improper recoupment of the bonus and sales commissions, these claims do not require a damages model supported by expert testimony because "Midland maintains data on the precise amount of such penalties it has levied." Mot. 8; cf. Leyva, 716 F.3d at 514 (explaining that the defendants' "computerized payroll and time-keeping database would enable the court to accurately calculate damages and related penalties for each claim.").

Midland does not appear to controvert this assertion. Instead, Midland contends that the surrender charges and interest adjustments allowed Midland to offer a higher credited rate to its annuity holders. See Weinisier Decl. ¶¶ 31-32, 34. Midland argues that the additional growth from this higher credited rate would have to be offset against any surrender charges or interest adjustments that were deducted. In particular, Midland insists that these offsets would create an intra-class conflict between classmembers who did not surrender (and thus benefitted from higher credited rates) and class members who did surrender (and were thus penalized by the surrender charges and interest adjustments).

This argument is simply a reiteration of an argument made by Midland in opposition to plaintiffs' initial motion for class certification. This Court squarely rejected these arguments as "nothing more than speculation on Midland's part." Dkt. 239 at 15. The Court declines to revisit that conclusion at this juncture. As such, the Court finds that certification is appropriate with respect to the surrender charge and interest adjustment claims.

## V.    CONCLUSION

In accordance with the foregoing, the Court hereby GRANTS in part and DENIES in part plaintiffs' renewed motion for class certification. The Court certifies the class with respect to plaintiffs' claims that the recoupment of commissions and bonuses was a breach of contract. The Court declines to certify the class with respect to plaintiffs' claims that the alleged recoupment constituted fraud, and a violation of the UCL.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

O

**CIVIL MINUTES - GENERAL**

| Case No. | 2:11-cv-05858-CAS(MANx) | Date | February 3, 2014 |
|----------|--------------------------|------|------------------|
| Title | ROSALIE VACCARINO V. MIDLAND NATIONAL LIFE INSURANCE COMPANY, ET AL. | | |

     The Court also certifies the class with respect to the contract, fraud, and UCL claims regarding interest adjustments, and the senior subclass with respect to the contract, fraud, and UCL claims regarding alleged violations of Cal. Insurance Code § 10127.13.

     IT IS SO ORDERED.

|  | 00 | 34 |
|---|---|---|
| Initials of Preparer | | CMJ |